Barbara **TIMBERLAKE**, a minor, by mother and father, Maggie and Thomas **TIMBERLAKE**, as next friends,

v.

David **BENTON** and Joan Richardson Gregory, Individually, and in their official capacities as Police Officers for the City of Springfield, the City of Springfield, Stanley Henderson, Individually, and in his official capacity as an Officer of the Robertson County Sheriff's Department and Jack Uffelman, Individually, and in his official capacity as Director of the Drug Task Force for the 19th Judicial District.

No. 3:89–1003.

United States District Court,
M.D. Tennessee,
Nashville Division.

Jan. 29, 1992.

■■■■■■■■■■■

Kevin Gene Steiling, William Leonard Underhill, Underhill & Steiling, Madison, Tenn., for plaintiff.

Darrell Gene Townsend, Howell, Fisher & Branham, Nashville, Tenn., for defendants Benton, Gregory & City of Springfield.

Michael Ernest Evans, Manier, Herod, Hollabaugh & Smith, Nashville, Tenn., for defendant Henderson.

Daniel Lynch Nolan, Jr., Landon W. Meadow, Daniel, Harvill, Batson & Nolan, Clarksville, Tenn., for defendant Uffelman.

## MEMORANDUM

JOHN T. NIXON, Chief Judge.

Plaintiff, a 17 year old female, brought this action under 42 U.S.C. § 1983 alleging a violation of her constitutional rights when the vehicle in which she was riding was stopped by officers of the 19th Judicial District Drug Task Force and she was strip searched in the back seat of a patrol car at the scene. Pending before this Court are motions for summary judgment filed by the Defendants.

Defendant Jack Uffelman, sued in his official capacity as the director of the 19th Judicial District Drug Task Force, seeks summary judgment on the ground that the Task Force is not a "person" under 42 U.S.C. § 1983 and therefore is not amenable to suit in this action. Officers David Benton, Joan Gregory, and Jack Uffelman in their individual capacities seek summary judgment on the basis of qualified immunity. The City of Springfield seeks summary judgment on the grounds that no policy or custom of the city permitted illegal searches, that the city provided adequate training to its officers, and that punitive damages may not be assessed against the city. Plaintiff has also asserted pendent state law claims which Defendants seek to have dismissed as within the exclusive jurisdiction of the state courts.

## BACKGROUND

This lawsuit arises out of an incident occurring in the early morning hours of June 3, 1989. At that time, Polly Stewart and her younger sister Barbara Timberlake, then 17 years old, were driving from Nashville to Springfield, Tennessee in a pinkish-red Nissan truck when they were stopped by Officer Benton of the 19th Judicial District Drug Task Force. The truck in which they were driving was thoroughly searched by several officers while a female officer, Joan Gregory, conducted a strip search of Ms. Stewart and Ms. Timberlake in the back seat of a patrol car alongside the highway. No drugs were found, although Timberlake turned over a pistol. Stewart was issued a citation and the two were permitted to leave.

The search and seizure came about as a result of Officer Benton's suspicion that the two were transporting illegal drugs. One or two days prior to the incident, Benton had received information from a confidential informant that a Mr. Willie Gene Ogburn was using the same pinkish-red Nissan truck to transport drugs between Springfield and Nashville in the early hours of the morning and on Sundays. The informant also indicated that Mr. Ogburn was short on cocaine and that he would soon be making a run to Nashville to pick up a new supply. This was the extent of the informant's information. No further details were provided and no information implicated Stewart or Timberlake in the trafficking of drugs. From Task Force undercover operations, Mr. Ogburn was known to be dealing in drugs and Officer Benton considered the informant to be reliable because information he had provided in the past had proven to be accurate. It was known to Officer Benton that Ms. Stewart was Mr. Ogburn's girlfriend.

At approximately 2:00 a.m. on June 3, 1989, Officer Benton observed the suspected truck as it left Springfield and headed toward Nashville. Because of the truck's tinted glass, he was unable to identify the occupants of the vehicle. The truck exited the Interstate and headed generally toward

the Settle Court area of Nashville, an area known for its drug problem. Benton broke off his surveillance of the truck and returned to the Springfield area to await the truck's return. While he had the truck under observation, he did not see it stop nor did he see anyone leave or approach the vehicle.

Sometime later, Benton observed the truck returning to Springfield and he began to follow it. Shortly thereafter, Officer Benton turned on his blue lights and stopped the truck. Benton approached the vehicle with his gun drawn. After ascertaining Stewart's identity and informing her of his suspicions, he ordered the women out of the truck. Stewart explained that they had been visiting friends in Nashville and denied that they were transporting drugs. She refused to consent to a search and Benton was asked if he had a search warrant. He replied that he did not need a warrant because he had reason to believe the truck was being used to transport drugs. Benton reholstered his gun and radioed for assistance. A short time later, Officer Gregory and others arrived on the scene and the search commenced.

Both Stewart and Timberlake were wearing T-shirts and "short shorts" which apparently left little room for concealing dangerous weapons. Nevertheless, Stewart had brought a pistol with her in the truck that evening and when Benton stopped them, Timberlake attempted to hide the gun in her shorts. Benton claims he observed Timberlake walking stiff-legged with a suspicious bulge in her shorts. Surprisingly, however, neither Stewart nor Timberlake were frisked at any time, nor was Timberlake ever asked about the bulge. Oddly enough, despite his alleged suspicions about Timberlake, Benton ordered Stewart searched first.

In accordance with instructions given by Gregory, Stewart sat in the back seat of the patrol car and removed her clothes while Gregory stood in the open doorway of the car with a flashlight in her hand and the dome light of the car on. After removing all of her clothes, Stewart was ordered onto her hands and knees in the back seat with her posterior facing the open doorway and the highway. With rubber gloves, Gregory inspected Stewart's anal and genital areas by spreading Stewart's buttocks. Gregory went through the clothing and shoes as well, but no drugs or weapons were found. Benton then sent Timberlake to be searched. Before she removed her clothes, she handed a pistol to Gregory and said, "you['re] going to find it anyway." The strip search was then completed in the same manner as before. As with Stewart, no drugs or other weapons were found. During the search, cars would pass within six to ten feet from the open door, and it is alleged by Plaintiff that others at the scene could see into the car while the search was conducted. According to Plaintiff, she was detained for nearly three hours. At no time were the women placed under arrest or informed of their rights. Stewart claims that Officer Benton threatened her with future strip searches unless she provided him with information about Ogburn.

## DISCUSSION

The Court notes at the outset that pending are Defendants' motions for summary judgment. The Court is here asked to determine if Defendants are entitled to judgment as a matter of law. The moving party has the burden of showing clearly and convincingly the absence of any genuine issues of material fact. *Sims v. Memphis Processors, Inc.*, 926 F.2d 524, 526 (6th Cir.1991). "[S]ummary judgment will not lie if the dispute ... is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). It is likewise true that "in ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated." *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425, 427 (6th Cir.1962). See also *Duchon v. Cajon Company*, 791 F.2d 43, 46 (6th Cir.1986). With this stan-

dard in mind, the legality of the events taking place on June 3, 1989, as described by the parties, will be addressed.

## I. Liability of Defendant Uffelman in his Official Capacity.

■ Plaintiff has named as a defendant, Jack Uffelman, in his official capacity as director of the 19th Judicial District Drug Task Force. Suits brought against persons in their official capacity are taken to be suits against the entity for which the named official is an agent. *Hafer v. Melo,* — U.S. —, —, 112 S.Ct. 358, 362, 116 L.Ed.2d 301 (1991); *Monell v. Department of Social Services,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978). Defendant Uffelman argues that he is not amenable to suit in his official capacity since the Task Force is not a person subject to suit under 42 U.S.C. § 1983.

The Supreme Court in *Monell* held that municipalities and other local government units are included among those persons to whom § 1983 applies. 436 U.S. at 690, 98 S.Ct. at 2035. However, the precise scope of the term "local government unit" is problematic. Is a drug task force, comprised of police officers from several counties and cities, which has a board of directors, its own budget and source of funding, its own policies, administration, and legal counsel, a "person" for purposes of § 1983? Plaintiff argues that it is a distinct entity and therefore open to suit. Defendant asserts that the Task Force is merely an agreement among several adjoining localities to pool certain law enforcement resources to stem the inflow of illegal drugs.

Courts which have addressed the meaning of "person," "entity," and "government unit" in § 1983 cases have not been uniform in their approach. Some courts have held that police departments are not entities subject to suit. See, e.g., *Eddy v. City of Miami,* 715 F.Supp. 1553, 1556 (S.D.Fla. 1989); *Baldi v. City of Philadelphia,* 609 F.Supp. 162, 168 (E.D.Pa.1985); *Reese v. Chicago Police Department,* 602 F.Supp. 441, 443 (N.D.Ill.1984); *Bradford v. Gardner,* 578 F.Supp. 382, 383 (E.D.Tenn.1984); *Williams v. Baxter,* 536 F.Supp. 13, 16 (E.D.Tenn.1981). Others have found that police departments were "persons" under § 1983 and therefore could be sued. See, e.g., *Pillette v. Detroit Police Department,* 661 F.Supp. 1145, 1150 (E.D.Mich. 1987); *Gaborik v. Rosema,* 599 F.Supp. 1476, 1481 (W.D.Mich.1984); *Kennibrew v. Russell,* 578 F.Supp. 164, 166–67 (E.D.Tenn.1983). Those courts finding police departments not amenable to suit typically base their decision on the principle that a police department is not separate from the city or county itself and as such is not a legal entity. The police department, in effect, is likened to an arm of the city and thus suit must be brought against the city itself.

The Task Force resembles a police department in that it is comprised of police officers and functions to enforce the law. However, it is distinguishable from the police departments discussed in the above cases in that the Task Force is not a department of any one city. It encompasses several counties and cities. It has a board of directors independent of any one city, and a unique source of funding. The authority for creation of the Task Force comes from two provisions of Tennessee law. Under T.C.A. § 12–9–104 (1987), as extended by T.C.A. § 6–54–307 (Supp.1991), any two or more public agencies or municipalities may enter into agreements for joint cooperation. In so doing, they may, but need not, create a separate legal entity. *Id.* at § 12–9–104(c)(2). Thus, it must be determined whether the parties to this mutual aid agreement created a separate legal entity in the 19th Judicial District Drug Task Force.

In the agreement, there is no explicit language indicating whether the "Drug Task Force Unit" is a legal entity formed to carry out the compact. Various provisions of the agreement tend to indicate that no distinct entity was created. For example, section 2(g) provides that each officer assigned to the Task Force by the participating locality shall remain an employee of the city or county assigning him and that his salary shall be paid by that city or county. Section 10 requires each party to provide its own liability coverage, and sec-

tion 12 indicates that if a party wishes to terminate its participation in the Task Force, all equipment furnished by it to the Task Force will be returned.[1] The fact that section 1 describes a "Board of Directors" does not in itself indicate the creation of a separate legal entity.[2] Section 8 reads as follows:

> The parties agree that they shall remain liable and responsible for the actions of their employees while assigned to the Task Force. Furthermore, the parties agree that, to the extent permitted by law, each party shall defend, indemnify, and save harmless the other parties, their officers, employees and agents from any and all claims, losses, damages, cost and expense, including attorney fees, arising or alleged to arise from personal injuries, death, property damage, civil rights violations, false arrest and other like claims resulting from or arising out of the actions of the parties' employees in connection with Task Force activities.

This section could be read to suggest the possibility of lawsuits brought against the Task Force itself, but could merely envision a lawsuit brought jointly against all of the separate cities and counties participating in the agreement.

Ultimately, the Court believes that the creation of a legal entity capable of being sued should not be left to chance. The law permitting cities and counties to enter into mutual aid agreements explicitly permits such agreements to function without the creation of a separate legal entity. Therefore, in the absence of clear indications that the Task Force is an entity, the Court will not imply its existence. The 19th Judicial District Drug Task Force is, therefore, a joint undertaking of several counties and cities and not a "person" amenable to suit under § 1983.

■ However, this does not end the inquiry. Although the Task Force is not a distinct entity open to suit, a lawsuit naming one of its officials in his official capacity is tantamount to a suit against the entities making up the Task Force. Those who would argue that an official capacity suit cannot be brought against a police official because the police department is not a distinct entity amenable to suit overlook the fact that the police official may be an official of the city or county which employs him. Thus, a suit brought against a police official need not be characterized as against the police department, and then dismissed for failure to name a "person" subject to suit. Instead, it may be an actionable suit against the city or county for which the police official acts. See, e.g., *Monell v. Department of Social Services*, 436 U.S. 658, 690 & n. 55, 98 S.Ct. 2018, 2035–36 & n. 55, 56 L.Ed.2d 611 (1978) (suit brought nominally against official of city's department of social services is actionable suit against city itself); *Brandon v. Holt*, 469 U.S. 464, 471–72, 105 S.Ct. 873, 877–78, 83 L.Ed.2d 878 (1985) (suit brought against "Director of Police, City of Memphis" is suit against city itself); *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1242 n. 1 (6th Cir.1989), *cert. denied*, 495 U.S. 932, 110 S.Ct. 2173, 109 L.Ed.2d 502 (1990) (suit against county sheriff essentially suit against county itself); *Marchese v. Lucas*, 758 F.2d 181, 187 (6th Cir.1985), *cert. denied*, 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 685 (1987) (same). Thus, a suit nominally brought against Uffelman as director of the 19th Judicial District Drug Task Force is in fact a suit against the cities and counties comprising the Task Force if Uffelman functions as a final poli-

---

1. This provision is consistent with the creation of a joint or cooperative undertaking rather than a legal entity. Under T.C.A. § 12–9–104(d)(2), when the mutual aid agreement does not establish a separate legal entity, the agreement must contain a provision for the manner of acquiring, holding and disposing of real and personal property used in the joint undertaking. That is precisely what this section does.

2. T.C.A. § 12–9–104(d)(1) requires that even if a mutual aid agreement does not create a legal entity, it must nevertheless form a joint board responsible for administering the undertaking. Moreover, the statute requires that the joint board include representatives from each agency participating in the agreement. The Task Force board is comprised in such a fashion.

cymaker for the Task Force.[3]

■ The preferred method of suing a city or county, however, is to name it in the complaint. If not named, the suit against the official may proceed only if the city or county, being the real party in interest, has received notice and an opportunity to respond. *Brandon*, 469 U.S. at 471–72, 105 S.Ct. at 878. In the instant case, defendant Uffelman argues that, except for the City of Springfield which was named in the complaint, the remaining cities and counties have neither received notice nor an opportunity to respond. Plaintiff has not addressed this allegation in her responses and, there being no indication in the record that the County of Montgomery, the City of Clarksville, and the County of Robertson have received notice and an opportunity to respond to this lawsuit, the action against them must be dismissed. Since the City of Springfield has been named separately in this action, it is unnecessary to determine whether a suit against Uffelman in his official capacity as director of the Task Force subjects Springfield to suit. The liability of Springfield is addressed below.

There being no grounds or reason to bring an action against Uffelman in his official capacity, the suit against him in his official capacity will be dismissed.

## II. Liability of Defendants Benton and Gregory in their Individual Capacities.

Plaintiff has named as defendants, Officers David Benton and Joan Gregory in their individual capacities. Both claim qualified immunity as a defense to this action. For the reasons discussed below, the Defendants' motion for summary judgment on these grounds will be denied.

### A. Qualified Immunity

■ Public officials enjoy a qualified immunity from liability in lawsuits brought under § 1983. Immunity, based upon an objective reasonableness standard, was established in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "[G]overnment officials performing discre-

tionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738.

In *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Supreme Court elaborated on the meaning of the *Harlow* standard. The *Anderson* Court restated the *Harlow* qualified immunity standard in these terms: "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action[,] *Harlow*, 457 U.S. at 819, 102 S.Ct. at 2739, assessed in light of the legal rules that were 'clearly established' at the time it was taken, *id.* at 818, 102 S.Ct. at 2738."

■ The Court then noted the operational difficulty in applying the standard absent some specificity in defining the "legal rule."

The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow*. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by

---

**3.** Uffelman's status need not be decided at this time since Plaintiff has failed to provide proper notice to the entities comprising the Task Force.

Uffelman's role in formulating Task Force policy is discussed below in Part III.

alleging violation of extremely abstract rights.

. . . . .

It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see *Mitchell [v. Forsyth],* 472 U.S. [511], 535, n. 12, 105 S.Ct. [2806], 2820, n. 12 [86 L.Ed.2d 411 (1985)]; but it is to say that in light of pre-existing law the unlawfulness must be apparent.

483 U.S. at 639–40, 107 S.Ct. at 3038–39. Thus, the standard for consideration of a qualified immunity defense raised by a public official is this: Has the § 1983 plaintiff shown that the actions of the defendant public official violated a clearly established constitutional right, the contours of which are sufficiently clear in light of pre-existing law that a reasonable public official would know that his actions violate that right? The Defendants argue that as of the date of the strip search, the Plaintiff possessed no clearly established and particularized constitutional right which was violated by Officers Benton and Gregory. The Court disagrees.

B. The Legality of the Search & Seizure

1. The Stop.

■ According to the deposition of Ms. Stewart, she had seen Benton's car following her throughout their trip to Nashville. However, since the car was unmarked, she did not know it was a police vehicle. When she spotted the car following her back to Springfield, she slowed down and at that point Officer Benton signaled her to stop by showing his blue lights. Benton, in his deposition, indicated that the only reason he stopped the truck was his suspicion that it was being used to transport drugs from Nashville to Springfield.

Officer Benton's suspicion was based upon information he had received from an informant a day or two earlier. He was told that Willie Ogburn and Tim Barbee "were fixing to leave and go to Nashville" to purchase cocaine, and that Ogburn used the pinkish-red Nissan truck in the early morning hours and on Sundays to transport the drugs. The Drug Task Force had been investigating Ogburn for some time and knew of his trafficking in drugs. At approximately 2:00 a.m. on June 3, 1989, Officer Benton spotted the truck travelling from Springfield to Nashville and back.

■ Under the doctrine of *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1968), police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity "may be afoot," even if the officer lacks probable cause. Such suspicion must be supported by some minimal level of objective justification. *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). Here, the suspicion was based upon an informant's tip. If the information carried with it sufficient "indicia of reliability," *Adams v. Williams,* 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972), then Officer Benton was justified in stopping the truck to investigate.

■ Benton claims that the informant had provided reliable information in the past and on that basis, he believed his tip. Generally, mere conclusory assertions that a certain informant is reliable are insufficient to show a basis for upholding the legality of a *Terry*-stop. See 3 Wayne R. LaFave, *Search and Seizure* § 9.3(e), at 480 (2d ed. 1987). However, since pending is a motion for summary judgment on qualified immunity grounds, the Court is not required to determine the mere legality of the stop, but instead is called upon to decide whether the action of the officer was so clearly in violation of constitutional law that he is unprotected by qualified immunity. Based upon the information available

to Officer Benton on June 3, 1989, the Court cannot say that his decision to investigate was contrary to clearly established precedent. Accordingly, Officer Benton is entitled to qualified immunity for the stop.

2. The Seizure.

 The Fourth Amendment protects persons from being seized by police absent probable cause. The authority of police to stop a person under *Terry* is only a limited exception to the probable cause requirement of the Fourth Amendment. Such investigatory stops must be "substantially less intrusive than arrests," *Dunaway v. New York*, 442 U.S. 200, 212–16, 99 S.Ct. 2248, 2256–58, 60 L.Ed.2d 824 (1979), and "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). In connection with a *Terry*-stop, police may "conduct a limited search—a pat-down for weapons—for the protection of the officer investigating suspicious behavior of persons he reasonably believed to be armed and dangerous ... [and he] may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause." *United States v. Brignon–Ponce*, 422 U.S. 873, 880, 882, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975).

 Officer Benton's justification for the stop was an informant's tip that Willie Ogburn, a known drug dealer, and Tim Barbee would, at some indefinite future date, transport cocaine in the truck. It was also believed that they operated in the early morning hours and on Sundays. Benton stopped the truck when he observed it at 2:00 a.m. on Saturday, June 3, 1989. He had no other information warranting the investigation.

Assuming that Officer Benton's suspicions were reasonable, any grounds for extending the stop or detaining the women vanished when he discovered, contrary to his information, that Willie Ogburn and Tim Barbee were not in the truck. Benton admits to having no information implicating Timberlake or Stewart in drug trafficking. Thus, he had no cause to detain either woman once he discovered their identities. *United States v. Thomas*, 863 F.2d 622, 628–29 (9th Cir.1988) (even though policeman's stop justified, subsequent detention and frisk unjustified where officer could see subject did not match description of suspect). See also 3 LaFave, *supra*, § 9.4(a), at 502.

The purpose of the stop was to intercept Willie Ogburn and Tim Barbee based upon the tip. When it became apparent that neither suspect was in the truck and that the informant's information was inaccurate, or at least premature, Officer Benton's only "grounds" for suspicion was that Stewart was Ogburn's girlfriend, Timberlake was Stewart's sister, they were riding at 2:00 a.m. in the truck often used by Ogburn, and were returning from a trip to Nashville. None of these facts point to criminal activity. Stewart's relationship to Ogburn, and the fact that the women were in Ogburn's truck, are undoubtedly insufficient in themselves to establish reasonable suspicion let alone probable cause. The Supreme Court unequivocally held in *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979), that

> a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.... [A] search or seizure of a person must be particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.

Under clearly established Fourth Amendment jurisprudence, the investigatory stop must have ceased once Benton's reasonable suspicions were resolved and any detention after that point, absent probable cause, violated Timberlake's constitutional rights.

Defendants argue, however, that reasonable suspicion remained because of the bulge in Timberlake's shorts and her stiff-legged walk. This argument is unpersuasive. First, Officer Benton realized that

neither Ogburn nor Barbee was in the truck before he ordered Timberlake out of the vehicle and observed her "suspicious" behavior. His investigation should have ceased before that point and hence no suspicion would have arisen but for the illegal detention. Second, even if he was within his authority to order Timberlake out of the truck, the police may not seek to verify their suspicions by means that approach the conditions of arrest. *Royer*, 460 U.S. at 499, 103 S.Ct. at 1325. Given the facts as presented in the depositions, and as construed favorably for Plaintiff, Timberlake was subjected to a seizure approaching a full arrest.

■ A person is "seized" within the meaning of the Fourth Amendment when, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980).

Applying this definition to the events occurring on June 3, 1989, there can be no doubt that Timberlake and Stewart were seized beyond a mere *Terry*-stop. After they were pulled over, Officer Benton approached the truck with his weapon drawn. He asked for identification and then ordered the women out of the truck. The women denied Benton's allegations, refused to consent to a search, and asked Benton for a warrant. Several other officers arrived on the scene. According to Timberlake, she was held for three hours while the vehicle in which she was riding was dismantled, searched, and reassembled by several officers. She was involuntarily escorted to a patrol car where she was ordered to strip naked and submit to visual inspection. Such a seizure goes far beyond a *Terry*-stop, is much more intrusive than is required to investigate the bulge, and therefore requires probable cause.

■ By no stretch of the imagination can probable cause be based on the facts presented in this case.[4] Accordingly, the seizure of Timberlake was unjustified, unreasonable, and a violation of clear Fourth Amendment precedent.

### 3. The Search.

■ Defendants next propose that a search of the women was justified and that Timberlake had no particularized and established constitutional right violated. Both the facts and the law are to the contrary.

■ The *only* circumstance present that early morning which could give rise to a suspicion was a bulge in Timberlake's shorts and her stiff-legged walk. Had the *Terry*-stop been permissible at the time Officer Benton's suspicions were aroused, *Terry* would have permitted a pat-down for weapons.[5] An officer may, without proba-

---

4. Although the informant's tip may have been sufficient to conduct an investigatory stop, the information provided was vague and fell far short of establishing probable cause. The tip contained no objective indicia of reliability which could be corroborated, as was the case in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). No precise time was given for the alleged drug transport, except that it usually happened in the early morning hours and Sundays. The informant had no information as to where the drugs would be picked up or how they would be hidden. Such general information, without more, does not provide probable cause.

The only detailed information provided by the informant—that Ogburn and Barbee would be in the truck—pointed against probable cause in this instance since neither was in the truck when the women were seized and searched.

5. Since Timberlake was a female, a pat down of her groin area by Officer Benton, where the bulge was spotted, would have been inappropriate under the circumstances. Procedures established by the City of Springfield Police Department, the department for which Officer Benton worked, provided that male officers could not conduct searches of a female suspects' groin area unless the female is known to have a weapon. However, when Officer Gregory arrived on

ble cause, conduct a search "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby, and may realistically be characterized as something *less than a 'full' search,* even though it remains a serious intrusion." *Terry,* 392 U.S. at 26, 88 S.Ct. at 1882 [emphasis added]. See also 3 LaFave, *supra,* § 9.4(b), at 520 ("The limited search permitted by *Terry,* it is important to remember, is to find weapons 'for the assault of the police officer,' not merely to find weapons; thus *there is no reason to cover every square inch of the suspects body.*") [emphasis added].

Instead of a pat-down, and despite his alleged suspicion of Timberlake, he reholstered his gun and sent Stewart to be strip searched first. This suggests that the search was not for weapons at all, but rather a search for evidence, or, as Plaintiff claims, an attempt to intimidate the two women into informing on Ogburn. It certainly cannot be argued that a complete strip search was necessary to secure the safety of the officers. Although the officers considered the stop to be merely a temporary investigative detention, *Terry* has never permitted full body searches without probable cause. "Detentions may be 'investigative' yet violative of the Fourth Amendment absent probable cause. In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person or of his automobile or other effects." *Royer,* 460 U.S. at 499, 103 S.Ct. at 1325. The mere presence of a suspicious bulge does not create probable cause to conduct a full search. Accordingly, the strip search of Timberlake indisputably violated her constitutional rights as guaranteed by the Fourth Amendment.

■ Defendants next argue that once the gun was discovered, they had probable cause to arrest the women and to conduct a complete search incident to arrest. This argument fails, primarily, because "[i]t is axiomatic that an incident search may not precede an arrest and serve as part of its justification." *Sibron v. New York,* 392 U.S. 40, 63, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968). See also *Smith v. Ohio,* 494 U.S. 541, 542–43, 110 S.Ct. 1288, 1290, 108 L.Ed.2d 464 (1990).[6] In this instance, the pistol was not discovered until after the search of the truck commenced, after Stewart had been strip searched, and after Timberlake had been taken by Officer Gregory to be strip searched. Before Timberlake removed her clothes, she handed the gun to Gregory and said, "you['re] going to find it anyway." The search had commenced before the officers had .probable cause to arrest or to search anyone or anything and it is evident that Timberlake would not have handed over the gun but for the imminent strip search. Thus, it is plain that the search cannot be justified as incident to a lawful arrest.[7]

■ Moreover, Timberlake was never arrested. (Stewart was given a citation for the gun, which was subsequently dismissed.) Full searches incident to arrest are justified on the basis of a contemporaneous *lawful custodial arrest. Rawlings*

---

the scene shortly thereafter, she could have conducted a pat-down for weapons. In any event, if Officer Benton suspected the bulge was a weapon, he could have asked Timberlake to remove it while he kept her under guard.

**6.** As observed by Professor LaFave:
If the police conduct a warrantless search of a person and find evidence of crime in the course of that search and then place the individual under arrest, it is clear beyond question that this search may not be justified as being incident to the subsequent arrest if the arrest is in turn based upon the fruits of the prior search. Such bootstrapping would render the Fourth Amendment a nullity.
2 LaFave, *supra,* ·§ 5.4(a), at 515.

**7.** Even assuming that the gun was found before the search began, this alone should not provide officers carte blanche authority to conduct a full pre-arrest strip search. In a very similar case, the Fourth Circuit held that the reasonableness of a stationhouse strip search of an arrestee should go to a jury where the arrestee's weapon had already been confiscated, a less intrusive pat-down was never conducted nor reasons provided for why a more limited search was not feasible, and the search was carried out in front of several other officers with the door partially open to the hallway. *Abshire v. Walls,* 830 F.2d 1277, 1280 (4th Cir.1987).

*v. Kentucky,* 448 U.S. 98, 111, 100 S.Ct. 2556, 2564, 65 L.Ed.2d 633 (1980); *United States v. Edwards,* 415 U.S. 800, 802–03, 94 S.Ct. 1234, 1236–37, 39 L.Ed.2d 771 (1974); *United States v. Pino,* 855 F.2d 357, 363 (6th Cir.1988), *amended,* 866 F.2d 147 (1989), *cert. denied,* 493 U.S. 1090, 110 S.Ct. 1160, 107 L.Ed.2d 1063 (1990); *Munz v. Ryan,* 752 F.Supp. 1537, 1546 n. 8 (D.Kan.1990); *Doe v. City of Chicago,* 580 F.Supp. 146, 151 (N.D.Ill.1983). These cases presume that the search was incident to an actual custodial arrest and not merely incident to probable cause to arrest. This follows from the history of the "search incident to arrest" doctrine.

The case which first expressed the authority of officers to search arrestees held that "[a] custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification." *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973). The basis for this holding was the recognition that "the danger to an officer is far greater in the case of the extended exposure which follows the taking of a suspect into custody and transporting him to the police station than in the case of the relatively fleeting contact resulting from the typical *Terry*-type stop." *Id.* at 234–35, 94 S.Ct. at 476. When the police have not decided to take a person into custody, there is little justification for a full search.

Since the officers never placed Timberlake under arrest, she was not subject to an intrusion upon her liberty which justified a full search. It goes without saying that she was never taken into custody and therefore there existed no extended danger to the police. Further, any arrest of Tim-

berlake would not have been lawful since the gun was not revealed until after the illegal search and seizure began, and, even if a lawful arrest could have been made, a full strip search would have been excessive under the circumstances.

In *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973), the Supreme Court noted that

> a long line of cases recogniz[e] an exception to the warrant requirement when a search is incident to a valid arrest. [*Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2039–40, 23 L.Ed.2d 685 (1969)]. The basis for this exception is that when an arrest is made, it is reasonable for a police officer to expect the arrestee to use any weapons he may have and to attempt to destroy any incriminating evidence then in his possession. The Court recognized in *Chimel* that the scope of a warrantless search must be commensurate with the rationale that excepts the search from the warrant requirement. Thus, a warrantless search incident to arrest ... must be limited to the area "into which an arrestee might reach."
>
> Where there is no formal arrest ... a full *Chimel* search would not have been justified ... without a warrant.... [However, where the individual is] sufficiently apprised of his suspected role in the crime to motivate him to attempt to destroy what evidence he could ... [t]he rationale in *Chimel,* in these circumstances, justif[y] the police in subjecting him to the very limited search necessary to preserve the highly evanescent evidence they found....

412 U.S. at 295–96, 93 S.Ct. at 2003–04. *Cupp* has been read strictly to require exceptional circumstances before a noncustodial search is permissible.[8] Extracting

---

**8.** See, e.g., *People v. Evans,* 43 N.Y.2d 160, 165, 400 N.Y.S.2d 810, 813, 371 N.E.2d 528, 531 (1977) [citations omitted]:

> To adopt the proposition that the search was valid because there was probable cause to arrest puts the cart before the horse. An arrest is an essential requisite to a search incident, otherwise once probable cause existed a potential arrestee would be fair game for

any intrusions the police deem appropriate for however long they allow him to remain at large. While it has been consistently held that there is no constitutional right to be arrested, the police may not utilize the existence of probable cause as a trump card to justify warrantless personal searches. Unless and until a person is arrested, a full body search

from the case law, Professor LaFave concludes that most appropriate test for a search conducted without an arrest is the rule of *Chambers v. Maroney*, 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970): probable cause that evidence will be found in the search plus exigent circumstances. 2 LaFave, *supra*, § 5.4(b), at 524.

Since Timberlake was not taken into custody, a full search was not necessary to safeguard the officers and prevent contraband from entering the jail. There were no exigent circumstances requiring immediate seizure of highly evanescent evidence. There was no reason to believe that Timberlake possessed any other weapons or evidence which could not have been found by less intrusive means. Accordingly, any way this search is sliced, it comes out contrary to clear and established law. As such, the officers are without immunity.

### 4. The Strip.

#### a. When Permitted.

 Even if one were to assume that a full search of Timberlake's person could have been conducted, a search must be " 'reasonably related in scope to the circumstances which justified the interference in the first place' ... and not excessively intrusive in light of the age and sex of the [person] and the nature of the infraction." *New Jersey v. T.L.O.*, 469 U.S. 325, 341–42, 105 S.Ct. 733, 743, 83 L.Ed.2d 720 (1985) (quoting *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879). In this case, the strip search was clearly excessive, unjustified, and unreasonable.[9] Knowing Timberlake to be a minor, and after Timberlake had

disclosed the source of the bulge by handing the pistol over to Officer Gregory, and without probable cause to believe Timberlake was carrying any other contraband, she was forced to remove all of her clothes and submit to a visual examination of her anal and genital areas in a car alongside the highway.

There is no doubt that strip searches are permissible under certain circumstances. The propriety of strip searches has been almost exclusively addressed in the context of arrestees, detainees, inmates, and persons crossing international borders.[10] Strip searches of prison employees and visitors have also been discussed in case law.[11] In all of these instances, the courts have balanced the privacy interests of the individual with the state's legitimate interest in preserving evidence and interdicting contraband, smuggling, and weapons. In these cases the individuals searched had a decreased expectation of privacy due to the circumstances underlying the incidents. Thus, arrestees, detainees, and prisoners have already had their liberty and privacy compromised. At international borders, an individual must expect that he may be subject to questioning and possibly a search of his person. Even prison guards and visitors possess decreased expectations of privacy from the fact that they are entering a dangerous environment known for weapons and contraband. In all of these instances, courts have found special circumstances warranting strip searches.

In the case of Timberlake, however, there were no special circumstances present. She was a private citizen legally

---

without a warrant or exceptional circumstances is constitutionally unreasonable.

**9.** "It does not require a constitutional scholar to conclude that a nude search of a [minor] is an invasion of constitutional rights of some magnitude. More than that: it is a violation of any known principle of human decency." *Doe v. Renfrow*, 631 F.2d 91, 92–93 (7th Cir.1980), *cert. denied*, 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981).

**10.** E.g., *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (inmates and detainees); *United States v. Des Jardins*, 747 F.2d 499, 504–05 (9th Cir.1984), *vac'd in part*, 772

F.2d 578 (1985) (border search); *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir.1983) (post-arrest detainees); *Dufrin v. Spreen*, 712 F.2d 1084, 1089 (6th Cir.1983) (arrestee).

**11.** E.g., *Daugherty v. Campbell*, 935 F.2d 780, 787 (6th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992) (prison visitors); *Security and Law Enforcement Employees District Council 82 v. Carey*, 737 F.2d 187, 204 (2d Cir.1984) (correction officers); *Shoemaker v. Handel*, 619 F.Supp. 1089, 1101 (D.N.J.1985), *aff'd*, 795 F.2d 1136 (3d Cir.), *cert denied*, 479 U.S. 986, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986) (discussing *Carey*).

travelling on a public highway. She was stopped by the police upon suspicions later discovered to be unfounded. Nevertheless, she was seized and strip searched for no other reason than a bulge in her shorts and a stiff-legged walk. Timberlake had no decreased expectation of privacy and the state's only interest in conducting a full search was the general interest in investigating crimes—an interest which, under the Fourth Amendment, the state is required to establish in each case by probable cause and to conduct in a reasonable manner.

 Strip searches are "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, [and] signifying degradation and submission." *Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1272 (7th Cir.1983). It is not surprising that the Supreme Court has set down a strict rule for strip searches: "to the extent that deeply intrusive searches are ever reasonable outside the custodial context, it surely must only be to prevent imminent, and serious harm." *New Jersey v. T.L.O.,* 469 U.S. at 382 n. 25, 105 S.Ct. at 764 n. 25. Therefore, to conduct an involuntary non-custodial strip search of a person, when there is no decreased expectation of privacy, requires both probable cause and especially exigent circumstances.[12]

In the circumstances where the individual does possess a decreased expectation of privacy and the state's interests are legitimate, courts have found that a strip search may be conducted, in a private manner, only upon a showing of reasonable suspicion.[13] Since a person in Timberlake's position has no decreased expectation of privacy, *a fortiori,* the "reasonable suspicion" required for a non-custodial roadside strip search is much greater than that required for the search of a prisoner or an ordinary *Terry* pat-down.[14] Courts have consistently observed that the greater the intrusiveness of the police action, the greater must be the grounds justifying that action. *Bilbrey by Bilbrey v. Brown,* 738 F.2d 1462, 1467 (9th Cir.1984); *Security and Law Enforcement Employees, District Council 82 v. Carey,* 737 F.2d 187, 208 (2d Cir.1984); *United States v. Quintero–Castro,* 705 F.2d 1099, 1100 (9th Cir. 1983); *M.M by C.M. v. Anker,* 607 F.2d 588, 589 (2d Cir.1979); *United States v. Afanador,* 567 F.2d 1325, 1328 (5th Cir.1978). A strip search is undoubtedly one of the most intrusive ordeals an individual may undergo.

It is indisputable that *Terry* does not permit strip searches. *DiLoreto v. Borough of Oaklyn,* 744 F.Supp. 610, 622 (D.N.J.1990) ("A strip search to look for weapons ... is patently unreasonable"). See also *Terry,* 392 U.S. at 26, 88 S.Ct. at

12. One court has found sufficiently exigent circumstances present when a person for whom there is probable cause to search for drugs requested to use the bathroom. The court noted that the suspect could have disposed of the drugs in the bathroom and so a strip search was appropriate. *Burns v. Loranger,* 907 F.2d 233, 238 (1st Cir.1990). But see *Munz v. Ryan,* 752 F.Supp. 1537, 1545–46 (D.Kan.1990). In the present case, even if probable cause existed, there were no exigent circumstances warranting a strip search. Timberlake was under constant guard and would have been unable to dispose of any evidence she possessed.

13. See cases cited in footnotes 10 and 11, *supra.*

It has been clearly established in the Sixth Circuit that a person arrested for a minor offense may not be strip searched absent individualized suspicion that the arrestee is carrying or concealing a weapon or other contraband. *Masters v. Crouch,* 872 F.2d 1248, 1255 (6th Cir.), *cert. denied,* 493 U.S. 977, 110 S.Ct. 503,

107 L.Ed.2d 506 (1989). A blanket policy permitting the strip search of all felons, even when the felony is not one normally associated with narcotics or weapons, may be impermissible as well. *Kennedy v. Los Angeles Police Department,* 901 F.2d 702, 713 (9th Cir.1989); *Logan v. Shealy,* 660 F.2d 1007, 1013 (4th Cir.1981), *cert. denied,* 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982).

14. Of course, as just discussed, such searches are permitted only where there exists probable cause and especially exigent circumstances. Since a reasonable officer may not have known of this precise requirement at the time Timberlake was searched, it is necessary for immunity purposes to determine what level of suspicion a reasonable officer should have known to apply in justifying a strip search. As discussed *infra,* the Court believes that any reasonable officer would have known that more suspicion was required to conduct a strip search than was present in this case.

1882; *Doe v. City of Chicago*, 580 F.Supp. 146, 151 (N.D.Ill.1983); 3 LaFave, *supra*, § 9.4(b), at 520. Otherwise, any suspicious bulge would provide reasonable grounds for ordering a strip search—a patently unacceptable result. A reasonable officer on June 3, 1989 should have known that a bulge alone could not provide sufficient cause to subject Timberlake to such an extraordinary intrusion.

Finally, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. at 500, 103 S.Ct. at 1325–26. See also *United States v. Wiggins*, 828 F.2d 1199, 1201 (6th Cir.1987). However, "[t]he question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *United States v. Sharpe*, 470 U.S. 675, 687, 105 S.Ct. 1568, 1576, 84 L.Ed.2d 605 (1985). In this case, the officers chose to dispel their suspicions over the bulge by conducting a strip search rather than a pat-down or frisk. The police here chose what seems to be the most intrusive means of investigation rather than the least. The officers clearly acted unreasonably in failing to take less intrusive steps. Thus, immunity may not shield the officers for this clearly unreasonable and excessive search.

b. Manner of the Strip Search.

■■■ No rationale could justify the strip search conducted under the circumstances as presented by Plaintiff in this action. Nevertheless, the Court must address, for purposes of the summary judgment motion, the additional issue of whether the manner of conducting the strip search was clearly unreasonable. The extent of the defendants' possible liabilities in the action may turn on this question.

In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Court observed that

[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. *Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.*

*Id.* at 559, 99 S.Ct. at 1884 [emphasis added].

The strip search was conducted in the back seat of a patrol car parked off of a highway in the early morning hours of a Saturday. The car was backed a short distance away from the scene of the truck's search to provide some privacy for the women. Nevertheless, the door facing the highway was open during the search and, according to the Plaintiff, the back seat was illuminated by the car's dome light and Officer Gregory's flashlight. Plaintiff also asserts that the male individuals on the scene, as well as passing motorists, could see into the car. The officers knew Timberlake was a minor.

■■■ It is self-evident that a strip search must be conducted in such a way as to safeguard the individual's privacy. "[A]s a matter of law, no police officer in this day and time could *reasonably* believe that conducting a strip search in an area exposed to the general view of persons known to be in the vicinity—whether or not any actually viewed the search—is a constitutionally valid governmental 'invasion of [the] personal rights that [such a] search entails.'" *Logan v. Shealy*, 660 F.2d 1007, 1014 (4th Cir.1981) (quoting from *Bell v. Wolfish*, 441 U.S. at 559, 99 S.Ct. at 1884). See also *Polk v. Montgomery County, Maryland*, 782 F.2d 1196, 1201 (4th Cir.1986) (whether search is conducted in private is "especially relevant in determining whether a strip search is reasonable under the circumstances."); *Iskander v. Village of Forest Park*, 690 F.2d 126, 129 (7th Cir.1982) (court would not even entertain suggestion that strip searches conducted in open view of others was reasonable).

■■■ In this instance, it appears that Officer Gregory took some steps to provide

a private location for the search. However, taking as true Plaintiff's allegations that others in the vicinity could see into the car during the search, the search would clearly be unreasonable. The intrusion on Timberlake's privacy was of the highest order, conducted in a public location and without reasonable justification. Because a reasonable jury could find from these facts that the search was clearly unreasonable, Defendants' summary judgment motion must be denied. *Keeler v. Hewitt*, 697 F.2d 8, 12 (1st Cir.1982).[15]

### III. Liability of Defendant Uffelman in his Individual Capacity.

■ Defendant Jack Uffelman, as director of the 19th Judicial District Drug Task Force, is responsible for the implementation of the policies and procedures developed by the Task Force's board of directors as well as the management and control of the day-to-day operations of the Task Force. He is the supervisor of the Task Force and reports directly to the board. He has the authority to recommend disciplinary action and the power to terminate an officer's assignment to the Task Force.

Plaintiff has brought suit against Uffelman individually, alleging that he established and endorsed, in writing or custom, policies under which defendants Benton and Gregory conducted their search of Timberlake, thereby participating in the deprivation of her constitutional rights. Uffelman counters that (1) he is not a supervisor of Benton or Gregory, (2) he is not a policymaker for the Task Force, (3) his actions after the search occurred cannot subject him to liability, (4) he is entitled to qualified immunity, and (5) he cannot be subjected to punitive damages since his conduct was not outrageous.

■ Despite Uffelman's claim that he did not supervise Benton or Gregory because they were technically employed by the Springfield Police Department, it is clear from the facts that he was their supervisor. As director of the Task Force, the officers assigned to the Task Force were under his direct control. A government official, however, is not subject to suit for the actions of his subordinates solely by reason of his status as supervisor. *Polk County v. Dodson*, 454 U.S. 312, 325, 102 S.Ct. 445, 453, 70 L.Ed.2d 509 (1981); *Rizzo v. Goode*, 423 U.S. 362, 370–71, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.), *cert. denied*, 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984).

■ Supervisory liability arises when there is "a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Bellamy*, 729 F.2d at 421 (citing *Hays v. Jefferson County*, 668 F.2d 869, 872–74 (6th Cir.1982)). In *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (6th Cir.1989), the court found evidence that a supervisor " 'implicitly authorized, approved, or knowingly acquiesced' in the action of the responsible [officers] as shown by the fact that it was not isolated or confined to Plaintiff [ ] and that he failed subsequently to punish the responsible individuals. Courts are not required to ignore the fact of life that policies can be and often are subtly but effectively promulgated by seemingly benign conduct." Plaintiff claims that similar strip searches were normal practice in the Task Force and that Uffelman's failure to recognize the illegality of the strip search and discipline the officers in this instance provides suffi-

---

15. Plaintiffs' substantive due process claim— that the strip search was sufficiently brutal to constitute a violation of due process under *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)—is appropriate for a jury in this case. Upon considering the need for the search, the intrusiveness of the event, and the allegation that the search was used as a tool to persuade the women to inform on Ogburn, a reasonable jury could find that the search sufficiently "shocks the conscience" to constitute a violation of due process. *Davis v. Forrest*, 768 F.2d 257 (8th Cir.1985).

cient evidence to withstand Defendant's motion for summary judgment.[16]

Although Uffelman admits that on numerous prior occasions strip searches have been conducted at the scene of an investigation, he claims that all these searches were carried out only upon probable cause. As discussed earlier, a roadside strip search is not per se unconstitutional. Such searches clearly require a high degree of justification and exigent circumstances and must be conducted in private. Uffelman's failure to recognize the clear lack of probable cause for the Timberlake search, and unreasonable manner which the search was conducted, raises sufficient doubts as to the propriety of earlier searches and the implicit and customary policies sanctioned by Uffelman to withstand a summary judgment motion.

The fact that the mutual aid agreement creating the Task Force placed policymaking exclusively with the board of directors, while relevant, is not dispositive of Uffel-

man's liability. Uffelman noted in his deposition that, except for some administrative policies, only one substantive policy has been set by the board—that the use of deadly force will be in accordance with state law. It is evident that the board of directors gave wide latitude to the Task Force director to supervise personnel and set policies for day-to-day business. As discussed above, policies need not be in writing for them to have effect and subject officials to liability. *Leach*, 891 F.2d at 1246. Moreover, although the post-search conduct of Uffelman is not a proximate cause of Timberlake's injuries, it is relevant to the question of the Task Force's policies regarding searches. *Id.* Since the conduct of Benton and Gregory has been found to clearly violate constitutional proscriptions, Uffelman likewise is unable to claim qualified immunity. On the basis of the evidence before the Court at this stage of the proceedings, the Court cannot say, as a matter of law and fact, that Uffelman did

---

**16.** With regard to the case at hand, Uffelman stated in his deposition that he found nothing unusual about the Timberlake search. He had "no apprehension or problem with what had been done. It was something that we had done before." Uffelman Deposition at 21–22.

Uffelman also admitted to numerous prior investigatory strip searches.

Q. [by Plaintiff's counsel] Okay. And you say that you had had incidences in the past where your Agents or you had made similar searches and seizures where you'd stopped people along the side of the road and strip searched them?

A. [Uffelman] Yes, sir.

Q. Tell me how many of these can you remember?

A. Several.

Q. Several. Okay. Can you tell me the latest one?

A. ... The latest one I remember right off the top of my head was, and I don't know if it was crack or cocaine. A dealer that had sold cocaine, we took her into custody and we had reason to believe she had other cocaine on her, plus some probably marked money. And a female, a black female. We stopped her car and got her out, checked the car, did not find what we were looking for. Brought a female Officer, one of our officers, had her placed in a vehicle where the female Officer did basically the same procedure. Had her remove or open her blouse, release her bra, would check her.... And finding nothing there she had

her drop her shorts.... And her panties. And turn around and bend over.

Q. Okay. Was this somebody you had already found drugs on?

A. No.

Q. ... [W]ere you personally involved in this?

A. Yes. I directed the female Officer to search her.

Q. Okay. And was she, was the suspect, the subject under arrest at the time?

A. I don't believe so. She might have, but I don't remember on whether—

Q. Would it make a difference to you as far as whether it was proper or not whether she was under arrest at the time or not?

A. No. If I had probable cause to believe she had drugs on her it wouldn't have made a difference at all.

A. We try to provide, if we can provide privacy, if we can do it without demeaning the person in a, you know, in a nice way ...

Q. Okay. Can you estimate for me how many of these type investigative searches and strip searches that you know of or have been involved in as Director of the Task Force?

A. I would guess probably around ten. Somewhere in that area.

*Id.* at 24–28.

not act with malice. Therefore, the Court cannot grant summary judgment regarding Plaintiff's punitive damage claim against Uffelman. Accordingly, as there exists material issues of fact concerning Uffelman's liability, his motion for summary judgment must be denied.

## IV. Liability of Defendant City of Springfield.

Plaintiff contends that the City of Springfield is liable for the conduct of Officers Benton and Gregory insomuch as they were employees of the Springfield Police Department and were acting in accordance with the policies and procedures of that Department. In *Monell,* the Supreme Court held that

> [l]ocal governing bodies ... can be sued directly under § 1983 for monetary ... relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

436 U.S. at 690–91, 98 S.Ct. at 2035–36.

The City of Springfield's official policy governing strip searches is taken directly from the Tennessee statutory policy located at T.C.A. 40–7–119. That policy provides as follows:

> (a) As used in this section, "strip search" means having *an arrested person* re-

move or arrange some or all of his or her clothing so as to permit a visual inspection of the genitals, buttocks, anus, female breasts or undergarments of such person.

> (b) No person *arrested* for a traffic, regulatory or misdemeanor offense, except in cases involving weapons or a controlled substance, shall be strip searched unless there is reasonable belief that the individual is concealing a weapon, a controlled substance or other contraband.

[emphasis added]. This policy explicitly sets guidelines for custodial searches of arrested persons. It provides no guidance for the search of suspects, nor does it set rules for the location of the search or the manner in which a search is to be conducted. This oversight is critical since the law governing the reasonableness of strip searches is founded upon such factors. In his deposition, Chief Wilhoit, the Springfield Chief of Police stated that this policy permitted non-custodial roadside investigatory strip searches of persons not yet arrested.

Chief Wilhoit conducted an investigation into the actions taken by Officers Benton and Gregory. Besides the two officers involved, Chief Wilhoit interviewed only two others. He never spoke to Timberlake or Stewart nor did he request a copy of the Tennessee Bureau of Investigation's report on the matter. Over the past fourteen years as Chief of Police, he has never disciplined an officer for improper arrest procedures, despite the filing of complaints by citizens.[17] In this instance, the Chief concluded that the officers acted properly within police procedures.

Even though no official written policy has been set by the City, *Monell* recognized that municipalities may be held liable for the unofficial customs sanctioned by local officials. 436 U.S. at 691, 98 S.Ct. at 2036. The Sixth Circuit has made a similar

---

**17.** The Court has no information as to whether the complaints Chief Wilhoit has received in the past had any merit. Moreover, the Chief's failure to discipline any officers may in fact indicate that the Springfield Police Department is well-trained and has made no improper arrests. While such a conclusion is possible, it would be extraordinary to suppose that no Springfield officer had acted improperly over the past fourteen years. This circumstance, therefore, must be considered along with the other facts to determine if a policy or custom of the Springfield Police Department permits or condones unreasonable searches of suspects and arrestees.

**696**

observation as to the way policies are promulgated. *Leach*, 891 F.2d at 1246. Liability may even be imposed for a single decision of a policymaker, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986), or a single brutal incident, *Owens v. Haas*, 601 F.2d 1242, 1246–47 (2d Cir.), *cert. denied*, 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979).

■ The City claims that because it has no official policy regarding non-custodial strip searches, or set guidelines for the manner and place where strip searches are to be conducted, it cannot be held liable. However, a failure to set a policy governing such a highly intrusive police action can render a City's actions as culpable as if they had a policy permitting unreasonable searches themselves. A local governing body does not shield itself from liability by acting through omission. Thus, when a city provides no guidance to its officers regarding such intrusive actions as strip searches, it must face the consequences of its inaction by being subject to suit. *Salinas v. Breier*, 695 F.2d 1073, 1077, 1084 (7th Cir.1982), *cert. denied*, 464 U.S. 835, 104 S.Ct. 119, 78 L.Ed.2d 118 (1983); *DiLoreto v. Borough of Oaklyn*, 744 F.Supp. 610, 623–24 (D.N.J.1990). Cf. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (city's deliberate indifference to training of officers subjects city to liability under § 1983); *Marchese v. Lucas*, 758 F.2d at 189 (sheriff's failure to train and ratification of unconstitutional behavior subjects county to suit). A reasonable jury could find in this instance that the City was deliberately indifferent to the constitutional rights of citizens like Timberlake through its lack of any written policy for noncustodial investigatory strip searches, and its police department's implicit sanctioning of such searches.

From the evidence submitted by Plaintiff, it appears that noncustodial investigatory strip searches have been conducted by Springfield officers and the Drug Task Force on numerous occasions. Chief Wilhoit believes such actions are proper and

sees no problems associated with the place the search is conducted or the custodial status of the individual searched. It even appears that Chief Wilhoit may permit strip searches of suspects upon mere suspicion rather than upon probable cause. Because there is no official written policy on strip searches, officers are given great discretion to conduct these searches and as of this date, it appears that the City has never found cause to question the propriety of any such search. Based upon these facts, a jury could conclude that an unwritten policy of the Springfield Police Department, as sanctioned by the Chief of Police, permits widespread use of strip searches of suspects at the scene of an investigation, without exigent circumstances and possibly even without probable cause, and with no guarantees that the search will be conducted in private. The City's motion for summary judgment must therefore be denied.

■ The City's partial motion for summary judgment, on the grounds that it cannot be subject to punitive damages, will be granted. Plaintiff concedes that in *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 263–64, 101 S.Ct. 2748, 2758, 69 L.Ed.2d 616 (1981), the Supreme Court found that § 1983 does not permit punitive damages against municipalities.

V. Liability of Defendants on Pendant State Law Claims.

■ Defendants ask this Court to dismiss Plaintiff's pendant state law claims of invasion of privacy, false imprisonment, assault and battery, and defamation. The basis for this motion is Tennessee's Governmental Tort Liability Act, as codified at T.C.A. § 29–20–103, *et seq.* As courts in this District have read the Act, it appears to place exclusive original jurisdiction for claims arising under it with the state courts. *Beddingfield v. City of Pulaski, Tennessee*, 666 F.Supp. 1064, 1067 (M.D.Tenn.1987). Accordingly, the Court will grant Defendants' motion to dismiss pendant state law claims as to the City of Springfield and Officers Uffelman, Benton, and Gregory in their official capacities.

The Tennessee Governmental Liability Act addresses the liability of governmental entities only. Its jurisdictional limitations do not apply to persons sued individually. Accordingly, the officers may be subject to personal liability in this Court for violations of both state and federal law arising from a common nucleus of operative facts. Judicial efficiency will be served by hearing, in a single court, all of the claims arising out of the events of June 3, 1989. Therefore, the claims brought against Officers Uffelman, Benton, and Gregory individually will remain.[18]

## CONCLUSION

The Court finds that, although defendant Uffelman may be subject to suit in his official capacity as director of the 19th Judicial District Drug Task Force, Plaintiff's failure to allege that the governmental units making up the Task Force have received notice and an opportunity to respond requires dismissal of the official capacity suit against Uffelman.

Barbara Timberlake did have a particularized and clearly established right to be free from the search and seizure visited upon her. Moreover, taking the facts most favorably for the Plaintiff, it can be concluded that the roadside strip search was conducted in an unreasonable and outrageous manner. A reasonable jury could find from these facts that the strip search shocks the conscience.

Defendant Uffelman, in his individual capacity, may be held liable as the director of the Task Force for authorizing and approving of the unconstitutional search and seizure of Timberlake. A jury could conclude from the facts that Uffelman's conduct implicitly authorized the unconstitutional strip search and was a cause of Timberlake's injury.

The City of Springfield, while not subject to punitive damages, may be held liable for injuries resulting from the strip search.

The City's police department has conducted similar searches on numerous occasions. The City has shown a deliberate indifference to the dignity of individuals and the protection of citizens from abusive searches by failing to formulate a written policy governing non-custodial investigatory strip searches. Moreover, the implicit authorization and widespread use of investigatory strip searches by the City's Chief of Police is sufficient to hold the municipality itself liable for the excesses of the Department's unwritten policies and procedures.

Finally, because Tennessee has vested sole jurisdiction in the state courts for state law claims against municipalities, this Court will not exercise its power of pendent jurisdiction over these claims. However, no such limitation is placed upon suits brought against officials sued in their individual capacity and for which they are individually liable. Therefore, the state law claims against Uffelman, Benton, and Gregory in their individual capacities will proceed in this action.

---

**18.** Although the Court dismisses the pendant state claims as against only some defendants and not others, the Court does not expect that the unseemly prospect of concurrent proceedings in both federal and state court will arise in this situation. Defendants argue that under the Governmental Tort Liability Act, the City will be immune from suit. T.C.A. §§ 29–20–201, –205 (1980 & Supp.1991).