Lauriat, J.
Defendant Anthony R. DiCicco, Jr. (“DiC-icco”) stands indicted under G.L.c. 94C, §32(b) for allegedly possessing heroin with the intent to distribute it. The defendant has now moved to suppress from evidence at trial 20 silver packets of white powder alleged to be heroin and $386.00 in currency that were seized from him by the Medford police while they were executing two search warrants. The warrants, one which authorized a search of DiCicco’s car and the other which allowed a search of his person, were issued by a Clerk-Magistrate and executed after the Medford police stopped DiCicco’s car on Boston Avenue in Medford, Massachusetts, on the evening of October 15, 1993.
The court conducted an evidentiary hearing on DiCicco’s Motion to Suppress Evidence on May 12,1994. It heard testimony from Sergeant David Montana (“Montana”), a detective assigned to the Medford Police Drug Unit, and from DiCicco. Several exhibits were offered into *175 evidence, including the physical evidence and pictures of the location of the search. Upon consideration of the testimony and credibility of the witnesses, the exhibits presented at the hearing, and the memoranda and arguments of counsel, the court makes the following findings of fact, rulings of law, and order with respect to defendant’s Motion to Suppress Evidence.
FINDINGS OF FACT
1. After an investigation which began in late September 1993, Montana applied for and received two search warrants from the Clerk-Magistrate of the Som-erville District Court on Friday, October 15, 1993. Montana’s affidavit that was submitted to establish probable cause included, but was not limited to, details about four controlled purchases of heroin made by a confidential informant (Cl) from DiCicco, information about DiCicco’s car, phone number, and place of residence, and allegations that DiCicco generally stored the heroin in his anus.
2. On the evening of October 15, 1993, Medford police officers conducted surveillance of DiCicco’s residence at 63 Lowell Street, in Arlington, Massachusetts. At approximately 7:30 p.m., DiCicco left his house and entered his car. Montana and another Medford detective then followed DiCicco’s car in an unmarked police vehicle. DiCicco travelled from Arlington to Medford and made at least two stops en route.
3. At approximately 7:50 p.m., DiCicco was stopped by a marked Medford police cruiser on Boston Avenue in Medford, near the intersection of University Avenue on the Tufts University campus. DiCicco pulled his vehicle over to the curb, along with the marked cruiser and two unmarked police cars.
4. After DiCicco stopped his vehicle, Montana approached the vehicle and ordered DiCicco to step out and move to the sidewalk. Montana then informed DiCicco about the two search warrants and asked DiCicco if he was in possession of drugs or weapons. DiCicco answered in the negative.
5. Montana then conducted a pat-down search of DiCicco’s jacket and dungarees. During that search, Montana found approximately $386.00 in cash in DiCicco’s right front pocket.
6. By this time, another police car, containing an officer and a dog from the Medford K-9 Corps, had arrived. With these latest arrivals, seven Medford police officers were present at the scene.
7. Montana then asked DiCicco to drop his pants and his underwear to the ground. DiCicco complied. Montana put on a pair of latex gloves, stepped to the front of DiCicco, and began inspecting DiCicco’s genital area using his flashlight. During this inspection, Montana briefly touched DiCicco’s genitals. Nothing was discovered during this search.
8. Next, Montana asked DiCicco to turn around and bend over. When DiCicco complied, a small plastic bag, approximately 2 inches in length and lA to Viz inch in thickness and secured by an elastic band, dropped from between DiCicco’s buttocks. The bag contained 20 silver packets stacked upon each other, also secured by an elastic band. The powder inside the packets was later tested and found to be heroin.
9. After Montana retrieved the package, he ordered DiCicco to pull up his underwear and pants, handcuffed him, advised him of his rights, placed him under arrest, and took him to the Medford police station. A subsequent search of DiCicco’s vehicle did not lead to the discovery or retrieval of any evidence.
10. The removal of DiCicco’s pants and underwear and the search of his genitals and buttocks by the police occurred on the sidewalk of a public street in a well-lit area. Boston Avenue is a main thoroughfare that has a high volume of vehicular traffic and pedestrians. In addition, the search took place within sight of a college dormitory, a parking lot in front of the dormitory, at least one nearby restaurant, passing vehicles, and several houses located across University Avenue.
RULINGS OF LAW
The Fourth Amendment of the United States Constitution, deemed incorporated into the Fourteenth Amendment and applicable to the states, bars unreasonable searches and seizures. Bell v. Wolfish, 441 U.S. 520, 558, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The test that must be applied to determine unreasonableness
is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.
Wolfish, 441 U.S. at 559 (citations omitted). The strict rule that the Supreme Court has set down for intrusive searches requires that “to the extent that deeply intrusive searches are ever reasonable outside the custodial context, it surely must only to be to prevent imminent, and serious harm.” New Jersey v. T.L.O., 469 U.S. 325, 382 n.25, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). “Therefore, to conduct an involuntary non-custodial strip search of a person, when there is no decreased expectation of privacy, requires both probable cause and especially exigent circumstances.” Timberlake v. Benton, 786 F.Supp. 676, 691 (M.D. Tenn. 1992).
In the present case, DiCicco contends that the evidence should be suppressed because (1) the search warrant issued for his person was insufficient to authorize a highly intrusive body cavity search, and/or (2) even if the search was authorized by the warrant, the warrant was executed in an unreasonable place and manner. The Commonwealth asserts that the strip search of the defendant was reasonable in time, place, and manner, given the fact that DiCicco was shielded from general public view by police personnel and given *176 the possibility that DiCicco could have destroyed the evidence.[1] After balancing the appropriate factors, this court concludes that the strip search of DiCicco in this case was unreasonable.
First, the scope and manner of the search was severe and highly intrusive. Not only was DiCicco required to drop his pants and underwear to the ground, but the search of his body included visual inspections of both his genital and anal areas as well as a touching of his genital area. There can be no doubt that strip searches in particular are “demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, (and) signifying degradation and submission.” Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1272 (7th. Cir. 1983) (citations omitted). The Supreme Court has described examinations of a person’s genital and anal areas without any sort of touching to be a practice which “instinctively gives . . . the most pause.” Wolfish, 441 U.S. at 558. The search at issue in the present case was even more invasive of DiCicco’s constitutional rights.
As for the place in which the strip search was conducted, the Fourth Circuit Court of Appeals has stated as a matter of law that “no police officer in this day and time could reasonably believe that conducting a strip search in an area exposed to the general view of persons known to be in the vicinity — whether or not any actually viewed the search — is a constitutionally valid governmental ‘invasion of personal rights that [such a] search entails.’ ” Logan v. Shealy, 660 F.2d 1007, 1014 (4th Cir. 1981) (emphasis in original) (quoting Wolfish, 441 U.S. at 559) (strip search, if conducted in location visible to anyone in general booking area, would be unreasonable). Other courts have agreed with this formulation. See Timberlake, 786 F.2d 676, 691-92 (strip search, if conducted in back seat of patrol car stopped on highway with door facing highway open and illuminated by flashlight and car’s dome light, would be unreasonable), and Iskander v. Village of Forest Park, 690 F.2d 126 (7th Cir. 1982) (routine strip searches conducted in a room open “to the prying eyes of passing strangers” unreasonable under Fourth Amendment).
The Commonwealth asserts that because DiCicco may have been shielded by parked cars, overhanging trees, seven police officers, and a dog, the strip search did not occur in public view. Even without addressing the Commonwealth’s contention that the seven officers and police dog who witnessed the strip search should not be considered “the general public” because they participated in the execution of the search warrants, the mere fact that the search occurred in a heavily-travelled public area and, by Montana’s own admission, directly under a street light, makes the manner of the strip search unreasonable, whether or not anyone else actually witnessed the event.
Third, a search must be “reasonably related in scope to the circumstances which justified the interference in the first place.” T.L.O., 469 U.S. at 341-42 (citations omitted). Therefore,
“the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer’s suspicion in a short period of time.” However, “[t]he question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or pursue it.”
Timberlake, 786 F.Supp. at 692 (citations omitted).
According to the Commonwealth, the search was warranted as a reasonable response to the situation. The Commonwealth argues first that it could not take DiC-icco into custody because the officers had not placed him under arrest, and second, that the strip search was necessary to prevent the destruction of evidence.
Once again, this court finds no merit to the Commonwealth’s contentions. Clearly, the officers could have used less intrusive means to effectuate their purpose, such as calling a police wagon and searching DiCicco behind its closed doors. The fact that DiCicco was surrounded by seven officers and a dog suggests to this court that the strip was not a “search for evidence . . . [but] an attempt to intimidate.” Timberlake, 786 F.Supp. at 688. In any case, it appears clear that the police “chose what seems to be the most intrusive means of investigation rather than the least [and] clearly acted unreasonably in failing to take less intrusive steps.” Id. at 692.
The Commonwealth’s final argument is that the plastic bag taken from DiCicco should not be suppressed because the Commonwealth could have lawfully obtained an arrest warrant for DiCicco and conducted a search of his person pursuant to that arrest, which search would have inevitably led to their discovery of the bag. See Commonwealth v. O’Connor, 406 Mass. 112 (1989). However, the Commonwealth has presented no evidence that the Medford police would have sought or procured an arrest warrant so as to justify such a search, id. at 117, and in this case, the constitutional violation occasioned by their search of DiCicco on Boston Avenue was so severe as to preclude the application of this exception to the exclusionary rule. Id at 117-18.
ORDER
For the foregoing reasons, the defendant Anthony R. DiCicco’s Motion To Suppress Evidence is ALLOWED.

 Both parties have stipulated for the purposes of this motion that the warrant contained sufficient facts to establish probable cause to search defendant’s person. The Commonwealth conceded at the hearing that the search warrant would be insufficient to authorize a body cavity search as required by Rodriguez v. Furtado, 410 Mass. 878, 888 (1991) (requiring, inter aka, the warrant to be issued by a judge and supported by “high degree of probable cause”).