Welch, J.
This motion to suppress presents troubling police conduct on the part of the Essex County Lynn Drug Task Force. The DrugTask Force was made up, in this instance, of certain State Police Officers, and an officer from the Federal Immigration and Naturalization Service, and various Lynn Police officers. One of the lead officers was Massachusetts State Trooper Alan Zanni, a law enforcement official with extensive experience in illegal drug investigations and prosecutions.
A Confidential Informant Talks
On February 19, 1997, then Trooper (now Sergeant) Zanni made an arrest of an individual who promptly became a confidential informant. This individual, while he was in custody, provided information identifying an alleged heroin dealer and provided the nickname of that dealer along with a physical description, the type of vehicle that individual drove, and a certain location where that individual would be. The confidential informant also provided information that this dealer would be in possession of a certain amount of heroin. Trooper Zanni received all of this information mid-afternoon on February 19, 1997. This information was fully confirmed when the alleged dealer arrived, fit the description in all material respects, and was found to have in his possession the amount of heroin that the confidential informant indicated that the dealer would possess. The alleged dealer was arrested by Trooper Zanni and other police officials.
A Man and a Small Black Dog
This confidential informant, after providing this reliable information, was released but remained with Trooper Zanni and provided the Trooper with further information. This informant, who by this point may legitimately be considered a reliable confidential informant, said that he knew a second heroin dealer in the Lynn area. He began to provide this information to Trooper Zanni between 5 and 6 p.m. on the same day, namely February 19, 1997. The confidential informant identified this second alleged heroin dealer as being an Hispanic male, in his early 20’s, of average height and' build, with the nickname Johvanny, who was dealing in heroin in the Union and Baldwin Street area of Lynn, and who arrived at his heroin deals accompanied by a small black dog. The confidential informant further stated that he had purchased large amounts of heroin from this individual nicknamed Johvanny in the past. The confidential informant, when further questioned, stated that the usual location for the heroin deals with this individual by the name of Johvanny was Caruso’s Pizza Parlor, an eating establishment located at Union and Baldwin Street in Lynn. The confidential informant stated that he would page Johvanny at his beeper number.
Trooper Zanni thereupon had the Essex County Lynn Drug Task Force set up a surveillance of the area. In particular, the surveillance included two apartment buildings in the area, both of which had a history of housing drug dealers. These two apartment buildings were 50 Baldwin Street and 249 Union Street. Once the surveillance was set up, the confidential informant paged Johvanny from a cellular phone. The informant was in the presence of Trooper Zanni at the time of the page. Soon thereafter, the confidential informant, still in the company of Trooper Zanni, received a return call. The confidential informant responded to the call and held a short conversation in Spanish. Trooper Zanni could not fully understand the entirety of the conversation but did understand that the informant and the other person returning the call were discussing the arrangement of a drug transaction. After the short phone call, the confidential informant turned to Trooper Zanni and informed him that Johvanny would be traveling to Caruso’s Pizza Parlor within fifteen minutes in order to deliver 10 grams of heroin. As Trooper Zanni had overheard, it had been *628 arranged that the 10 grams of heroin would cost $1,000.
Ten grams of heroin is a large amount of heroin for the Lynn area. It is the type of amount that a larger dealer would usually be selling to a smaller dealer. Given the quantity, it is not a typical amount for a dealer to be selling to a user. To be able to produce this quantity of heroin within 15 minutes indicated to a law enforcement official of Trooper Zanni’s extensive experience that the heroin dealer would be in direct contact with a large stash of heroin. Within the 15 minute period, one of the police officers surveilling the scene (an Officer Delano) observed the defendant leaving the apartment building at 50 Baldwin Street and heading directly towards the pizza parlor. The defendant was observed to be Hispanic, of average height and build, and walking with a small black dog. Once the defendant was within two buildings of the pizza parlor, the confidential informant pointed to the defendant and stated that the defendant was Johvanny and that he was the one who was here to deliver the heroin. The defendant had traveled directly from 50 Baldwin Street towards the pizza parlor.
An Arrest on the Street
Once the confidential informant provided this information, and before the defendant was arrested, Trooper Zanni took care to drive the confidential informant away from the scene. He returned four to five minutes later to find that the other officers conducting this surveillance had detained the defendant and were speaking to him in English. The defendant was detained outside of the pizza parlor on the public streets of Lynn. Several officers stopped the defendant and surrounded him. One of these officers was Lynn Police Officer Kenneth Estes, another member of the Essex County Lynn Drug Task Force. Officer Estes stopped the defendant approximately two doorways away from the pizza parlor. It was in front of this doorway, on a public sidewalk, that the defendant was asked various questions, in English, regarding his identity.
After identifying himself as a police officer, Officer Estes patted down the defendant. Estes was looking for both weapons and drugs. Officer Estes searched the defendant’s jacket pockets and pant pockets and found neither drugs or a weapon. During the pat down he asked the defendant his name. The defendant responded that his name was Michael Leal. Officer Estes also asked the defendant where he was coming from and the defendant responded that he was coming from around the corner at 50 Baldwin Street. The defendant made these responses in English and was able to understand English. Officer Estes then asked the defendant what apartment he was coming from at 50 Baldwin Street and the defendant responded with two apartment numbers, 3 and 17. During this inquiry, no police officer provided the defendant any Miranda warnings.
During the midst of this inquiry by the police officers, Trooper Zanni returned. Trooper Zanni joined the questioning and asked the defendant if he had any identification. The defendant stated that he did not. Trooper Zanni then asked where the defendant had come from and the defendant responded that he had recently moved from New York. Trooper Zanni then asked the defendant if he had any drugs on his person and the defendant responded in the negative. Thereupon, Trooper Zanni searched the defendant for a second time. This search included a search of his pockets, socks, and the waist band of his belt. Trooper Zanni also directed other police officers to search the collar worn by the small black dog which accompanied the defendant. No drugs were found.
This search occurred slightly after 7:00 p.m. around the corner from, but not in view of, 50 Baldwin Street.
Even though the officers were unsuccessful in finding any drugs upon the defendant, Trooper Zanni remained convinced that the defendant did have drugs on his person. At this time, although not formally charged, Trooper Zanni had no intention of allowing the defendant to leave voluntarily. Given all the circumstances, the defendant plainly was under arrest at this time. See Commonwealth v. Sanderson, 398 Mass. 761, 766 (1986).
This arrest of the defendant and the search pursuant to the arrest was supported by probable cause under the two-prong Aguilar-Spinelli standard. The informant had demonstrated his reliability previously that day. In addition, the informant had personally purchased heroin from the defendant. Commonwealth v. Montanez, 410 Mass. 290, 299-00 (1991). Furthermore, the informant had arranged a purchase of a large quantity of heroin within the presence of the police officers. Commonwealth v. Richardson, 37 Mass.App.Ct. 482, 485 (1994), rev. denied, 419 Mass. 1104 (1995). Finally, the informant had provided detailed information regarding the name and appearance of the defendant, the location in which he sold heroin, the precise time period in which the heroin sale was to occur, the precise location of the proposed heroin transaction (the pizza parlor), and other unique detailed information relating to the presence of a small black dog. All of this detailed information was corroborated by independent police surveillance. See Commonwealth v. Cast, 407 Mass. 891, 896 (1980). Thus, it is rather easy to conclude that the police had probable cause to arrest the defendant at the time that they observed the defendant walking with his black dog within 15 minutes of the phone call directly to the location where the heroin transaction was to transpire.
Although the defendant was not formally charged or notified that he was under anrest, the search that occurred on the sidewalk was permissible because probable cause to arrest existed independent of the *629 results of any search. Commonwealth v. Johnson, 413 Mass. 598, 602 (1992).
As the defendant was being questioned and searched, or in the immediate aftermath of this activity, a woman by the name of Joyce Noonan approached the officers surrounding the defendant and asked what was going on. Officer Estes asked Ms. Noonan if she knew this individual who identified himself as Michael Leal. Ms. Noonan stated that she did and offered the information that she was the manager of the apartment building located at 50 Baldwin St. Ms. Noonan stated that the defendant’s name was Johvanny and that he lived at 50 Baldwin Street in Apartment No. 17.
The defendant argues that the fact that the initial searches did not uncover any drugs on the person of the defendant or upon his dog diminished any probable cause to arrest the defendant and rendered any further detention of the defendant illegal. In the circumstances of this case, such an argument is unpersuasive. Although the initial searches of the defendant revealed no drugs, Ms. Noonan’s almost contemporary offer of information regarding the defendant’s identity helped to increase any probable cause to arrest. The information volunteered by Ms. Noonan corroborated the confidential informant’s information that the defendant’s name was Johvanny and that Johvanny was a heroin dealer. Ms. Noonan’s information also indicated that the defendant had provided a false identify to the police and that he lived nearby. Thus, the extent to which the failure to discover drugs diminished probable cause in any way it is more than offset by Ms. Noonan’s information. Therefore, the police still had the right to detain the defendant.
I credit Trooper Zanni’s testimony that he remained convinced that the defendant had drugs on his person given the detailed information that he had received from the confidential informant and the information provided by Ms. Noonan. Furthermore, I credit Trooper Zanni’s testimony that he intended to strip search the defendant pursuant to the drug charges as soon as Trooper Zanni could transport the defendant to an appropriate location. Trooper Zanni appropriately did not wish to strip search the defendant on a public street. See Commonwealth v. DiCicco, 2 Mass. L. Rptr. 174, 176 (Middlesex Super. Ct. July 4, 1994) (Lauriat, J.) (strip search on public street in Medford unreasonable). Furthermore, I credit the testimony of the Lynn Police officers that such a strip search was the standard procedure followed by the Lynn Police Department incident to any arrest. Thus, had Trooper Zanni immediately transported the defendant down to the Lynn Police station, strip searched the defendant, and found drugs upon the defendant, there would be little to this motion to suppress. Life, however, is often not so simple.
In this case, Trooper Zanni and Officer Estes apparently became diverted from immediately proceeding to the station and further searching the defendant because of the tempting information that they had obtained from both the defendant and Ms. Noonan regarding his nearby residence. Trooper Zanni realized, given his vast experience in drug investigations, that anyone who could promise to deliver such a large quantity of heroin on such short notice would likely have an even larger quantity of heroin at their nearby residence or in a location near their residence.
An Unconstitutional Diversion
Upon receiving the information from Ms. Noonan regarding the defendant’s name and residence (and already having obtained from the defendant his admission of living at two apartment locations at 50 Baldwin Street), Trooper Zanni took a set of keys from the defendant’s person.
As stated previously, the defendant, at this point, had never been advised of his Miranda rights even though he was plainly in custody. Nevertheless, certain of the questions asked of him, such as his identity and residence would be considered routine “booking inquires” not subject to the Miranda requirement. Commonwealth v. Mahoney, 400 Mass. 524, 528-29 (1987). Thus, the information regarding the defendant’s name, and the two apartments mentioned by the defendant at 50 Baldwin Street were not illegally obtained. It is impossible, however, to justify Trooper Zanni’s taking of the keys from the defendant and his subsequent actions. Contrast, Commonwealth v. Moses, 408 Mass. 136, 141 (1990) (taking of car keys justified during traffic stop where officer approached vehicle whose motor was running with suspects inside).
Armed with the information obtained from Ms. Noonan and the defendant, Trooper Zanni instructed various of the police officers to continue to detain the defendant while he and Officer Estes went to 50 Baldwin Street. Trooper Zanni used one of the keys to enter the apartment building located at 50 Baldwin Street. It is questionable whether Trooper Zanni and Officer Estes were entitled to enter this locked common area of the apartment building. See Commonwealth v. Rivera, Sup. Crim. Action No. 94-CR77-360 (Grabau, J.).
Upon entering the apartment building, the officers proceeded to knock on the door of Apartment No. 3. Trooper Zanni and Officer Estes encountered a young woman in this apartment who stated that she knew a Johvanny, that she was caring for his child, and that he lived in Apartment No. 17 with his wife, Diane.
Thereupon, the officers went to Apartment 17 and knocked on the door. There was no response and the officers opened the door by using the keys. Such an entry into the defendant’s apartment could only be justified by exigent circumstances. Commonwealth v. Viriyahiranpaiboon, 412 Mass. 224, 226-227 (1992). None existed in this case. There was no likelihood of *630 destruction of evidence in that the defendant had been arrested out of view of the apartment. Commonwealth v. Martino, 412 Mass. 267, 276 (1992). Thus, the police officers could have adequately secured the apartment without actual entry into the apartment pending the obtaining of a warrant. Upon all the circumstances of this case, the Commonwealth has not proven that exigent circumstances existed. Thus, the entry into Apartment No. 17 was illegal.
Trooper Zanni and Officer Estes then did a protective sweep of the apartment and noticed, in plain view, cut plastic baggies on the floor. Such cut baggies are frequently used in the illegal drug trade. Trooper Zanni then radioed to the officers who were holding the defendant on the street and requested that they bring the defendant to Apartment 17.
Trooper Zanni confronted the defendant in his bedroom at Apartment 17. At this point, the defendant was provided his Miranda warnings. Approximately 30 minutes had passed since the defendant was first stopped. The defendant stated that he understood these warnings and that he would talk to the officers. At this point, the defendant was alone in his bedroom with numerous police officers and was in custody. The Commonwealth has not proven, in the circumstances of the case, that this was a valid waiver of the defendant’s Miranda rights. See Commonwealth v. Mandile, 397 Mass. 410, 412-13 (1986). In these circumstances, any waiver was far from being made free and voluntarily. Once the Miranda rights are given, Trooper Zanni again asked the defendant his name and the defendant again responded that his name was Michael Leal. Trooper Zanni then asked if the defendant had any documents in the apartment which would prove his identity. The defendant responded that he did not. Trooper Zanni then noticed a pile of documents on a bureau and asked the defendant if he could look at these documents. The defendant stated “sure, go ahead.” Again, the Commonwealth has not proven that this consent to search was voluntarily and freely given in these rather coercive circumstances. Commonwealth v. Krisco Corp., 421 Mass. 37, 46 (1995). Trooper Zanni then looked at the pile of documents and noticed the last name of Vizcaino. Trooper Zanni then turned to the defendant and, making a calculated guess, stated to the defendant that: “your name is Johvanny Vizcaino.” The defendant agreed to this accusation. Trooper Zanni then asked why the defendant had hid his identity and the defendant confessed that he was illegally in the United States from the Dominican Republic. At that point, Special Agent Gaeto from the federal Immigration and Naturalization Service, who was present with other Task Force members, stated that such a confession would be sufficient to hold the defendant on immigration charges.
Because of the defendant’s confession that he was illegally in the United States, Trooper Zanni did not go ahead and strip search the defendant in the privacy of his apartment. I credit Trooper Zanni’s testimony that he intended to strip search the defendant in the apartment and that this was one of the primary reasons for requesting that the defendant be brought to the apartment. Trooper Zanni decided to defer .the strip search because he knew that such a strip search would occur incident to the defendant’s formal arrest on the immigration charges at the Lynn Police Station.
A Booking and a Search
Trooper Zanni then instructed a Lynn police officer to take the defendant to the Lynn Police Station where he was booked on the immigration charge. Trooper Zanni specifically requested the transporting officer to inform him of the results of any search. The defendant was transported to the Lynn Police Station and was booked. During the booking, the defendant indicated that he wished to go the bathroom. At this point the booking officer indicated that he would have to strip search the defendant before he went to the bathroom. As stated previously, such a strip search was standard procedure. The defendant was strip searched and two packets of heroin were found in his underpants weighing approximately 10 grams. This, of course, was the amount that had been arranged to be purchased by the confidential informant. The booking officer promptly passed this information along to Trooper Zanni. This search occurred approximately an hour after the initial detention of the defendant outside of the pizza parlor.
The booking officer communicated the results of the search to Trooper Zanni who was back at Apartment 17 securing the apartment. Trooper Zanni then left the apartment (with Officer Estes) and went to the Lynn Police Station in order to prepare an application for a search warrant. Various officers of the Drug Task Force were left behind to secure the apartment. An application for a search warrant was obtained. That application need not be detailed here because it is part of the record. It is sufficient to state that application sets forth information which was both legally obtained (such as the confidential informant’s information, the independent police observation of the detailed information, the reliability of the confidential informant, the defendant’s attempts to hide his identity, the size of the heroin purchase, the nearby location of the defendant’s residence to the location of the heroin purchase, and other matters) and information that was obtained later during the illegal entry into the apartment and invalid questioning (e.g. real identity, fact of illegal entry into the United States). A search warrant was obtained. The search resulted in the discovery of a significant amount of heroin.
As set forth above, any information obtained during the protective sweep of Apartment no. 17, entry into the 50 Baldwin St. building, or bedroom interrogation of the defendant was illegally obtained and must be suppressed. Therefore, in evaluating the search war *631 rant affidavit, one must excise those portions of the application. Commonwealth v. White, 374 Mass. 132, 138-39 (1977), aff'd, 439 U.S. 280 (1978). Thus, one would excise almost all of paragraphs 9, 10, and 11 of the affidavit. If one does this, there still is sufficient information establishing probable cause in the search warrant affidavit application if one considers the information (contained in paragraph 13) relating to the search of the defendant at the Lynn Police Station whereupon 10 grams of heroin were found in his underwear. See Commonwealth v. Vynortus, 369 Mass. 17, 23-25 (1975). Without this information, the search warrant application appears to fail. Therefore, the key question is whether or not the strip search of the defendant at the police station, which occurred approximately an hour after his initial detention, was valid.
I find that the search was valid. It is clear that Trooper Zanni and other officers of the Drug Task Force intended to strip search the defendant as soon as practicable after his detention on the streets of Lynn. As set forth above, there was probable cause to hold the defendant on the heroin distribution charge. The fact that the defendant was not strip searched on the public street is perfectly understandable. The delay caused by the illegal actions of entering the defendant’s apartment is troubling — but not fatal. Commonwealth v. Bowlen, 351 Mass. 655, 657, cert. denied, 389 U.S. 916 (1967) (search incident to arrest valid although conducted at station over an hour after street arrest). The defendant was transported to the Lynn Police Station within approximately an hour of his initial arrest. This is not an undue delay. Contrast, Commonwealth v. Alvarado, 420 Mass. 542, 554 (1995) (search two hours after arrest not contemporaneous in time and therefore invalid). Even if the immigration charge had not been filed, the defendant would have been strip searched at the Lynn Police Station. Granted, the defendant would have been strip searched more promptly at the police station had Trooper Zanni not made the unwise choice of being diverted by entry into 50 Baldwin Street, but the defendant would have been searched nonetheless. The fact that he was formally charged with an immigration violation makes little difference because this Court finds that the defendant could legitimately have been searched pursuant to what was in effect his arrest on drug charges.
The defendant argues that the search at the police station was an invalid “inventory search." Borrowing from the automobile inventory search cases, the defendant asserts that the Lynn police had no written standard policy or practice regarding inventory searches of persons. See Commonwealth v. Rostad, 410 Mass. 618, 622 (1991). This argument, however, misses an essential point. Namely, the search that occurred was not an inventory search but one done (as a standard practice) pursuant to an arrest. Although not yet formally charged with a drug offense, such a search was supported by probable cause and was for the purpose of discovering contraband. The contraband in this case, of course, being illegal narcotics, and thus, “evidence of the crime for which the arrest has been made.” To repeat, this is true even though the arrest was not formally made on drug charges. See G.L.c. 276, §1.
In these circumstances, and with some reluctance, this Court concludes that the strip search of the defendant at the police station was valid and that the fruits of that search should not be suppressed. Likewise, the search pursuant to the search warrant was also valid and the fruits of that search should not be suppressed. Any observations made by the officers during their initial entry into 50 Baldwin Street and any statements made by the defendant during his initial interrogation at 50 Baldwin Street must be suppressed. Thus, the defendant’s motion is denied in part and allowed in part.